Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*


Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*


United States District Court
Eastern District of New York                                    1:20-cv-02210

| | |
|---|---|
| Pankaj Sharma, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| Wegmans Food Markets, Inc., | |
| Defendant | |

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Wegmans Food Markets, Inc. ("defendant") manufactures, distributes, markets, labels and sells lowfat yogurt products purporting to be flavored with vanilla and "other natural flavors", under the Wegmans brand ("Product").

2.      The Product is available to consumers from defendant's retail stores and website and is sold in containers of 6 OZ.

3.      The relevant front label representations include "Wegmans," "Vanilla," "Lowfat

Yogurt," "With Other Natural Flavors" and a vignette of the vanilla flower and vanilla beans.



4.      The representations are misleading because the amount of vanilla is de minimis and the front label fails to disclose that the non-vanilla "other natural flavors" deceptively enhance and extend the vanilla taste, which is a deceptive practice unique to vanilla, owing to the continuous attempts to use substitute flavors of lower quality and less value.

I.      Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

5.      Among yogurt flavors, vanilla is a perennial favorite, and is the third-most preferred according to a recent survey by FONA International, a flavor company.[1]

---

[1] What's Next for Yogurt: A Global Review, FONA International

6.     The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla,

7.     Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[2]

8.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[3]

9.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[4]

10.    This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

11.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[5]

12.    Though "food fraud" has no agreed-upon definition, its typologies encompass an

---

[2] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[3] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[4] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[5] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A. Food Fraud as Applied to Vanilla

13. Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[6]

14. The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[7]

15. The highlighted entries describe deceptive practices used by defendant in selling and marketing its Vanilla Low fat yogurt.

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[8]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better |

---

[6] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[7] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[8] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| | resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br><br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[9]<br><br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[10]<br><br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |

[9] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[10] Berenstein, 423.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  - o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

➤ Ingredient List Deception[11]
  - o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
  - o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor[12]
  - o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

16.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.
>
> *The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[13]

---

[11] A recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

[12] The numerous "naturally produced vanillins" are just as potent as their synthetic predecessors, such that "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."

[13] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

II.      Requirements for Food Labeling to Prevent Consumer Deception

17.   Standards of identity for foods were established to protect consumers from economic adulteration – the substitution of more valuable ingredients and replacement with less valuable and harmful ones. *See* 21 U.S.C. § 343(g).

18.   Standards of identity are described as "recipe" standards because they require standardized foods to contain specific ingredients in specific amounts.

19.   Standards of identity reflect a recognition by Congress of the inability of consumers to determine the relative merits of a variety of products superficially resembling each other based on informative labeling in places other than a product's front label, such as from an ingredient list.

20.   Standards of identity also reflect the intention of Congress to preclude manufacturers and courts from determining for themselves whether a food purporting to be a standardized food was permitted to contain different ingredients or different amounts of ingredients and determine consumers could not have been misled due to a product which deviated from a standard.

21.   Standards of identity are a bulwark against consumer deception for reasons not limited to the following:[14]

1.   Preventing confusion by reducing uncertainty faced by consumers making purchasing decisions and must select amongst numerous similarly labeled products;

2.   Eliminating possibility of economic adulteration of standardized foods through substitution of lower quality ingredients;

3.   Increasing the informational value of a product name, i.e., "vanilla," through restricting the range of information that can be conveyed by that product name;

4.   Once a food has been standardized, the product name associated with that food, i.e.,

---

[14] Christopher Chen, "Food and drug administration food standards of identity: Consumer protection through the regulation of product information." Food & Drug LJ 47 (1992): 185.

"vanilla," acquires a precise and specific meaning that it did not have prior to the creation of the standard.

22.    New York State has adopted and incorporated in its entirety, all provisions of the Federal Food, Drug and Cosmetic Act ("FFDCA") through its Agriculture and Markets Law ("AGM") and the accompanying regulations. *See* Title 1, Official Compilation of Codes, Rules and Regulations of the State of New York ("NYCRR").

23.    The New York State regulations addressing the labeling of lowfat yogurt state:

The standards of identity for butter, whipped cream, milk, acidified milk, cultured milk, concentrated milk, sweetened condensed milk, sweetened condensed skimmed milk, lowfat dry milk, nonfat dry milk, nonfat dry milk fortified with vitamins A and D, evaporated milk, evaporated skimmed milk, lowfat milk, acidified lowfat milk, cultured lowfat milk, skim milk, acidified skim milk, cultured skim milk, dry whole milk, dry cream, heavy cream, light cream, light whipping cream, sour cream, acidified sour cream, eggnog, half-and-half, sour half-and-half, acidified sour half-and-half, yogurt, lowfat yogurt, and nonfat yogurt, as set forth in section 58.2621 of title 7 of the *Code of Federal Regulations* (revised as of January 1, 2010) and in sections 131.110; 131.111; 131.112; 131.115; 131.120; 131.122; 131.123; 131.125; 131.127; 131.130; 131.132; 131.135; 131.136; 131.138; 131.143; 131.144; 131.146; 131.147; 131.149; 131.150; 131.155; 131.157; 131.160; 131.162; 131.170; 131.180; 131.185; 131.187; 131.200; 131.203; and 131.206, respectively, of title 21 of the *Code of Federal Regulations* (revised as of April 1, 2010), are adopted and incorporated by reference herein.

1 NYCRR § 17.18, Additional standards of identity for milk and milk products at Chapter I ("Milk Control*), Subchapter A ("Dairy Products"), Part 17 ("Requirements for the Labeling of, and Definitions and Standards of Identity for, Milk, Milk Products and Frozen Desserts") (emphasis added).

24.    Vanilla products are the only flavorings subject to standards of identity.  *See* 21 C.F.R. Part 169 ("Food dressings and flavorings"); 21 C.F.R. §169.3 ("Definitions"); 21 C.F.R. § 169.175 – 21 C.F.R. § 169.182 (vanilla products).

25.    Prior to adoption of vanilla standards, "the widespread and exceedingly serious adulteration of vanilla extracts that are now labeled 'pure'…deprive[d] the consumer of value the

8

product is represented to have, and for which the consumer pays.[15]

26.    The vanilla standards were intended to "insure, for the protection of both the consumers and our industry, that all vanilla products are correctly labeled and meet at least minimum standards."[16]

27.    The objective basis for the standards is the requirement that a "*unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla beans," or 13.35 ounces.[17]

28.    The vanilla standards are adopted and incorporated verbatim into New York law:

the commissioner hereby adopts the following as the standards of identity and/or standards of quality, and tolerances for food and food products as published in title 21 of the Code of Federal Regulations…21 CFR part 169, containing the Federal definitions and standards for *Food Dressings and Flavorings* at pages 600-606.

1 NYCRR § 250.1(a)(17) at Chapter VI ("Food Control"), Subchapter C, Food and Food Products, Part 250, ("Definitions and Standards").

29.    To prevent companies from deceiving consumers about the type and amount of flavoring in a product, federal regulations exist which require a product's flavoring to be represented in a specific way based on its composition.

30.    Consumers are accustomed to products which truthfully and non-deceptively designate their primary characterizing flavor in a consistent format, set by federal regulations:

---

[15] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Memorandum of Telephone Conversation between Mr. Alfred Daibock, Commercial Policy Division, Department of State and Tom Bellis, Food Standards Branch, FDA (the FDA stated, "The prime purpose sought to be served by the standards adopted was to promote honest, fair dealing with housewives and other consumers of the flavorings covered by the standards").

[16] Letter from McCormick & Company Inc. to HEW Secretary, January 15, 1960; Press Release U.S. Department of Health, Education, and Welfare, September 13, 1963.

[17] 21 C.F.R. §169.3(c) referencing 21 C.F.R. §169.3(b).

If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor…

21 C.F.R. § 101.22(i)(1)

31.     These regulations have been adopted in their entirety and without modification by New York State, through the regulations accompanying N.Y. AGM Article 17:

the commissioner hereby adopts the current regulations as they appear in title 21 of the Code of Federal Regulations (revised as of April 1, 2013; U.S. Government Printing Office, Washington, DC 20402), in the area of food packaging and labeling as follows…(3) Part 101 of title 21 of the Code of Federal Regulations, containing the Federal definitions and standards for Food Labeling (including Appendices) at pages 10-172.

1 NYCRR 259.1(a)(3) contained in Section 259.1 ("Packaging and labeling of food.")

32.     The result is that the New York State labeling requirements for vanilla lowfat yogurt is identical to those established by the FDA.

33.     If the labeling of vanilla lowfat yogurt is inconsistent with the federal standards, then it also violates what New York requires.

III.     Shortage of Vanilla Leads to Cut Corners and Consumer Deception

34.     For decades, The Flavor and Extract Manufacturers Association ("FEMA") successfully protected consumers from misleading and fraudulent vanilla labeling through a system of "self-policing" where companies were held accountable to industry standards which followed federal regulations.

35.     However, FEMA was strong-armed into abandoning these efforts and disbanding its Vanilla Committee due to alleged financial pressure from its largest members.

36.     Into this gap, flavor and food companies quickly reverted to practices which had been

eradicated with the promulgation of the vanilla standards in the early 1960s.

37.    The flavor industry benefits from high vanilla prices and the use of less real vanilla.

38.    The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[18]

39.    When less vanilla is available, customers of flavor companies – food manufacturers – must purchase higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

40.    According to Suzanne Johnson, vice president of research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

41.    The head of "taste solutions" at Irish conglomerate Kerry plc, urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

42.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[19]

43.    These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including "naturally produced vanillin," potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[20]

---

[18] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.
[19] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[20] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

IV.     Misleading to Designate Product as "Vanilla With Other Natural Flavors" Because "Other Natural Flavors" "Boost" the Vanilla Taste Which is Misleading and Prohibited

44.     The front label of the Product is required to be "accompanied by a declaration indicating the presence of any characterizing flavoring as specified in 101.22 of this chapter." *See* 21 C.F.R. § 131.203(f) ("Nomenclature.").

> **Ingredients:** Cultured Pasteurized Grade A Lowfat Milk, Sugar, Natural Flavor, Vitamin A Palmitate, Vitamin D3.

45.     Where a food contains some flavor "from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor," the front label is required to be labeled with the term "with other natural flavor" or "WONF." *See* 21 C.F.R. § 101.22(i)(1)(iii) ("If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words 'with other natural flavor'").

46.     Given that the front label of the Product contains the statement "With Other Natural Flavors," the "Natural Flavor" consists of some vanilla and some non-vanilla components.

47.     WONF labeling and flavors do not apply to vanilla products in the same way it does for non-vanilla flavors because vanilla products are not controlled by the general flavoring regulations but by the vanilla standards.  *Compare* 21 C.F.R. § 101.22 with 21 C.F.R. § 169.175-21 C.F.R. § 169.182 (vanilla products).

48.     The standards of identity for vanilla ingredients prohibit the addition of non-vanilla natural flavors and allow only glycerin, propylene glycol, sugar, dextrose, corn syrup or vanillin. *See* 21 C.F.R. § 169.175(a)(1)-(5) (ingredients permitted for addition to vanilla extract); *see also*

21 C.F.R. § 169.180(a) (permitting "not more than 1 ounce of added vanillin" for "each unit of vanilla constituent, as defined in 169.3(c)" in the combination labeled "Vanilla-vanillin extract."); *see also* 21 C.F.R. § 169.181 (Vanilla-vanillin flavoring), 21 C.F.R. § 169.182 (Vanilla-vanillin powder).

49.   The reason the vanilla standards do not provide for the addition of "other natural flavors" is because they were developed precisely to *prevent* companies from providing a "trace" of vanilla spiked by non-vanilla flavors which imitated vanilla but were cheaper and lower quality than vanilla, such as maltol, piperonal and "natural vanillin," from sources other than vanilla beans.

50.   Because the Product's flavor appears to consist of a trace of vanilla *and* either naturally produced vanillin, maltol and/or piperonal, a front label designation of "Vanilla With Other Natural Flavors" is misleading.

51.   According to representatives of FEMA:

The standards for vanilla extract and the other standardized vanilla products at 21 CFR 169 expressly do not provide WONF designation. This means that a flavoring mixture of vanilla extract and vanillin produced through a "natural" process (i.e. a process consistent with the definition of natural flavor at 21 CFR Section 101.22(a)(3)) cannot be described as "vanilla extract WONF," "vanilla WONF" or other similar descriptive terms.

John B. Hallagan and Joanna Drake, The Flavor and Extract Manufacturers Association of the United States, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018.

52.   A reasonable consumer cannot follow up or learn the truth that the Product contains a small amount of vanilla that is "fortified" (adulterated) by "natural flavors."

53.   Reasonable consumers do not expect vanilla ingredients to contain non-vanilla flavor enhancers unless they are conspicuously disclosed as being "non-vanilla flavors" or in certain instances, "artificial flavors."

V.      Conclusion

54.     Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

55.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers like plaintiff.

56.     The value of the Product that plaintiff purchased and consumed was materially less than their value as represented by defendant.

57.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

58.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $2.49 for containers of 6 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

59.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

60.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

61.     Plaintiff Pankaj Sharma is a citizen of New Jersey.

62.     Defendant Wegmans Food Markets, Inc., is a New York corporation with a principal place of business in Rochester, Monroe County, New York and therefore is a citizen of New York.

63.     "Minimal diversity" exists because plaintiff and defendant are citizens of different

states.

64.    Under 28 U.S.C. § 1391(c)(2), defendant, a corporation, is considered a resident "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Gen. Elec. Capital Corp. v. Titan Aviation, LLC*, No. 06-cv-4795, 2007 WL 107752, at *6 (S.D.N.Y. Jan. 16, 2007) ("A corporate entity or multi-member partnership is considered a resident of any district where it is subject to personal jurisdiction.")

65.    Since New York has more than one judicial district and defendant is a corporation subject to personal jurisdiction in New York at the time of filing, defendant is "deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State."  28 U.S.C. § 1391(d); *Abergel v. Atlas Recovery Sober Living*, No. 19-cv-6339 (S.D.N.Y. Aug. 19, 2019) ("Where a state has more than one judicial district, a defendant corporation generally "shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State" citing 28 U.S.C. § 1391(d)).

66.    Venue is proper because defendant is deemed to reside in this district because it operates one of its stores in this district, at 21 Flushing Ave, Brooklyn, New York 11205. 28 U.S.C. § 1391(b)(1) ("Venue in General. – A civil action may be brought in – (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located").

67.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

Parties

68.    Plaintiff Pankaj Sharma is a citizen of Edison, Middlesex County, New Jersey.

69.    Defendant Wegmans Food Markets, Inc. is a New York corporation with a principal

place of business in Rochester, New York, Monroe County.

70.     During the relevant statutes of limitations, plaintiff purchased the Product within his district and/or State for personal consumption and/or use in reliance on the representations the Product's flavor contained vanilla and was not enhanced by non-vanilla flavors including artificial flavors.

71.     Plaintiff  purchased the Product at defendant's store(s) including the location in Woodbridge, New Jersey and the most recent purchase occurred in January 2020.

72.     Plaintiff bought the Product because he liked the product type for its intended use and expected its vanilla flavor to not be enhanced by artificial flavors

73.     Plaintiff would buy the Product again if assured it did not contain vanilla-enhancing ingredients in addition to vanilla and if it was labeled in a non-deceptive manner.

<u>Class Allegations</u>

74.     The class will consist of all purchasers of the Product who reside in New Jersey and New York during the applicable statutes of limitations.

75.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

76.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

77.     Plaintiff is an adequate representatives because his interests do not conflict with other members.

78.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

79.     Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

80.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

81.     Plaintiff seeks class-wide injunctive relief because the practices continue.

### New York General Business Law ("GBL"), §§ 349 & 350
### (Consumer Protection Statutes)

82.     Plaintiff incorporates by reference all preceding paragraphs.

83.     Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

84.     Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

85.     Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Product.

86.     The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that "other natural flavors" may and actually do, include artificial flavors in the context of vanilla.

87.     Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

88.     Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

89.     Plaintiff incorporates by reference all preceding paragraphs.

90.     Defendant misrepresented the substantive, quality, compositional, organoleptic

and/or nutritional attributes of the Product.

91.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that "other natural flavors" may and actually do, include artificial flavors in the context of vanilla.

92.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

93.   This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

94.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

95.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

96.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

97.   Plaintiff incorporates by reference all preceding paragraphs.

98.   The Product were manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

99.   The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that "other natural flavors" may and actually do, include artificial flavors in the context of vanilla.

100.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

101.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

102.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

103.  Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

104.  The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

105.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

106.  Plaintiff incorporates by reference all preceding paragraphs.

107.  The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect that "other natural flavors" may and actually do, include artificial flavors in the context of vanilla.

108.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front labels, when it knew its statements were neither true nor accurate and could mislead consumers.

109.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Unjust Enrichment

110.  Plaintiff incorporates by reference all preceding paragraphs.

111.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   May 17, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311

Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-02210
United States District Court
Eastern District of New York

Pankaj Sharma, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Wegmans Food Markets, Inc.,

Defendant

## Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
    Tel: (516) 303-0552
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  May 17, 2020

                                                    /s/ Spencer Sheehan
                                                    Spencer Sheehan